IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 19, 2015 Session

**STATE OF TENNESSEE v. MICAH ALEXANDER CATES**

**Appeal from the Criminal Court for Carter County**
**No. 21779     Jon Kerry Blackwood, Judge**

**No. E2014-01322-CCA-R3-CD – Filed September 28, 2015**

The Defendant-Appellant, Micah Cates, was convicted by a Carter County jury of vehicular homicide by intoxication. Prior to trial, the Defendant moved the trial court to suppress evidence obtained from a warrantless blood draw. The trial court denied the motion and the case proceeded to trial where the State introduced evidence of the Defendant's blood alcohol content. Following the Defendant's conviction, the trial court imposed the minimum sentence of eight years with a release eligibility of 30 percent. The trial court denied alternative sentencing and ordered that the Defendant serve his sentence in confinement. On appeal, the Defendant argues that (1) the trial court erred in denying his motion to suppress evidence obtained from his warrantless blood draw, and (2) the trial court abused its discretion in sentencing the Defendant. Upon our review, we conclude that no exception to the warrant requirement justified the warrantless blood draw in this case. Accordingly, we reverse the trial court's denial of the Defendant's motion to suppress evidence obtained from the blood draw and vacate his conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and D. KELLY THOMAS, J., joined.

Steven R. Finney, Johnson City, Tennessee, for the Appellant, Micah Alexander Cates.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Beldsoe, Assistant Attorney General; Tony Clark, District Attorney General; and Janet Hardin, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On August 14, 2012, the Defendant-Appellant was involved in a single-car accident on Milligan Highway in Elizabethton, Tennessee. The Defendant was injured,

and his passenger, Tanner Perkins, was killed. Subsequently, the Defendant was indicted by the Carter County Grand Jury of vehicular homicide by intoxication, vehicular homicide by conduct creating a substantial risk of death, and driving under the influence ("DUI") with a blood-alcohol concentration of .08 percent or more, in relation to this accident. Prior to trial, the Defendant moved to suppress evidence obtained from the warrantless blood draw conducted while the Defendant was at the hospital receiving treatment for his injuries. Also prior to trial, upon motion of the State, the trial court dismissed the counts charging vehicular homicide by conduct creating a substantial risk of death and DUI.

## SUPPRESSION HEARING

Captain Greg Workman[1] of the Elizabethton Police Department ("EPD") testified that on August 14, 2012, he received a dispatch at 1:47 a.m. to a single-car accident on Milligan Highway. He arrived at the scene within five minutes of the dispatch and found a white BMW "intertwined with a metal pole in the Milligan Grocery parking lot" and an individual, later determined to be the Defendant, lying outside of the driver's side door. Captain Workman observed another individual in the passenger seat of the car and attempted to make contact with the Defendant to determine the number of occupants in the car and their identities. The Defendant appeared to have an open fracture to his left leg and was "obviously in pain" and "confused." He was unable to recall the number of occupants in the car or the identity of the individual in the passenger seat. While assessing the scene, Captain Workman smelled an "odor of alcohol, but could[ not] determine whether or not it was coming from [the Defendant] or from the vehicle."

Because of his injuries, the Defendant was soon transported by ambulance to the Johnson City Medical Center ("JCMC"). Captain Workman testified that he "knew it was a possibility" that the Defendant was under the influence of alcohol at the time of the accident, and based on the totality of the circumstances, he believed that "exigent circumstances existed and [the police] needed to draw blood as soon as [the Defendant] got to the hospital." He explained, "[There was] a high impact collision to a fixed structure[,] . . . [and the Defendant] was lying in the roadway with an open fracture to his leg. We [were] concerned not only about the injuries that we observed externally, but [also] the internal injuries that he could have[.]" He directed an officer to follow the ambulance and obtain a blood sample from the Defendant.

---

[1] At the time of the suppression hearing, Captain Workman had been promoted to Chief of Police at the Elizabethton Police Department. For clarity, we will use the title of "Captain," which he held at the time of the accident.

On cross-examination, Captain Workman testified that he observed the Defendant for approximately 45 seconds to one minute while on the scene. He also stated that he had investigated three mandatory blood draw cases and had never sought a search warrant to draw the suspect's blood. He agreed, however, that he had drafted approximately 40 search warrants in his career and had taken 20 to 25 search warrants to a nearby judge's house "at all hours of the night." He further agreed that two judges lived within a few miles of the accident scene and were willing to receive officers at any hour of the night to sign search warrants. He acknowledged that the EPD has search warrant templates and that search warrants can be drafted based on knowledge received from other officers. He also acknowledged that the officers on the scene had cell phones and radios but stated that there were no officers on duty at the police station at the time of the accident. He conceded that four of the 11 officers that responded to the scene had experience drafting search warrants.

On redirect examination, Captain Workman testified that to get a search warrant that evening, an officer would have had to return to the police station, draft a search warrant, contact the district attorney to have the warrant reviewed, and then contact a judge to have the warrant signed. He reiterated that "time was [of] the essence on this case" and stated that he needed all of the responding officers on the scene. When asked what exigencies existed in this case, Captain Workman stated,

> When I viewed the [Defendant] I viewed the injury to his leg. I knew that he was going to be transported to the hospital hot, which [means] emergency. I knew that he was going to be going into surgery and I didn't want anything else to be put into his system prior to us drawing that blood.

He agreed that he was also concerned about the natural dissipation of alcohol from the Defendant's system and the time it would take to get a search warrant before drawing his blood. He added that "if the accident [were] to happen tonight I would have done nothing different than what I did that particular night . . . [because] I felt exigent circumstances existed[.]"

EPD Officer Ryan Brackett arrived on the scene at approximately 2:50 a.m. where he observed a single-car accident that occurred when the car "failed to negotiate [a] curve and struck a pole" in the parking lot of Milligan Grocery. He described the accident as "horrific" and recalled that the motor was thrown approximately 40 feet from the car and the pole "intru[ded] into the vehicle" on the passenger's side to the rear seat. When Officer Brackett arrived on the scene, which was over an hour after the initial dispatch, the Defendant had already been transported to the hospital and the victim had been extricated from the car. On cross-examination, Officer Brackett testified that he had drafted search warrants in the past but had never drafted a search warrant for a mandatory

blood draw. He agreed that the EPD had a "form" or "outline" for search warrants available and that he had a cell phone and radio in his car that evening. He also agreed that 11 officers responded to the scene that evening and that two officers were sent to get blood samples from the Defendant and the victim, leaving nine officers on the scene to investigate.

EPD Officer Matt Sexton, who arrived within 10 minutes of the dispatch, described the scene as "a mess." He explained that there was "a large field of debris" and "parts of the vehicle [that] were thrown quite a distance from the actual crash scene." In addition to the responding police officers, the fire department and emergency medical services were also on the scene. Captain Workman directed Officer Sexton to follow the ambulance transporting the Defendant to the hospital to obtain a blood sample from him. He recalled that the Defendant was transported "hot," meaning that the ambulance used its emergency lights and audible signals during transport, and agreed that there was a "high sense of emergency and urgency." At the hospital, Officer Sexton directed a nurse to collect a sample of the Defendant's blood. He observed the Defendant lying on a gurney at the hospital but did not make contact with him and could not tell whether the Defendant was conscious or unconscious. Officer Sexton testified that the Defendant's blood was drawn at 2:30 a.m. On cross-examination, Officer Sexton testified that he was at the hospital approximately 20 minutes.

Lindsey Jones, a registered nurse-anesthetist working at JCMC on August 14, 2012, put the Defendant under anesthesia for surgery at approximately 7 a.m. that day. She testified that when she met the Defendant in the surgery holding unit, his chart indicated that he had been administered Versed, a benzodiazepine drug that causes amnesia. His chart also indicated that he was administered Zofran, Dilaudid, Ancef, and Gentamicin intravenously. In order to put the Defendant to sleep, Jones administered Propofol, Lidocaine, Syccinylcholine, Rocuroniun, and Fentanyl.[2] Jones testified that of the drugs administered to the Defendant, Versed, Dilaudid, and Fentanyl would show up on a toxicology screen, but the other drugs would not show up on a screen. On cross-examination, Jones agreed that these drugs were administered to the Defendant while he was in the surgery holding unit around 7 a.m. and not while he was in the trauma unit when he first arrived at the hospital.

Agent Stephanie Dotson of the Tennessee Bureau of Investigation ("TBI") testified as an expert in forensic toxicology. She received a sample of the Defendant's blood from the EPD and performed an alcohol analysis on it to determine its blood alcohol content, the results of which she memorialized in a report that was introduced into evidence at the hearing. When asked whether certain drugs, like benzodiazepine or

_____

[2] The names of these drugs were spelled phonetically in the transcript.

Dilaudid, could impact a toxicology analysis, she responded, "[w]hen a drug screen is run[,] we can find benzodiazepine. We cannot find Dilaudid, so, it would not show up." She added that if a sample of blood were drawn "fairly recently" after the patient was administered a benzodiazepine drug, the toxicology analysis would not detect it yet.

Following the hearing, the trial court denied the Defendant's motion in an order on October 23, 2013. In finding exigent circumstances existed to justify the warrantless blood draw, the court made the following findings:

> This accident occurred late at night after the Elizabethton City Police Department had no officer on service at the police department. The collision[] occurred when the [D]efendant failed to negotiate a slight turn on Milligan [Highway]. The collision was violent and . . . . [d]ebris was scattered throughout the scene. It was obvious to Captain Workman that the [D]efendant was seriously injured. The officer believed that the [D]efendant had internal injury and surgery might be immediate. The officer had no way to phone the [Police] Department to start the search warrant procedure. No officer on the scene had a laptop computer in order to use a template to print off a proposed search warrant. In order to obtain a search warrant, the officer would have to return to the Police Department. Once at the Department, he would be required to draft the search warrant and call an Assistant District Attorney to review the warrant. Then the officer would have to contact on[e] of the Judges for their signature. This process would have taken some time to complete. The officer knew that surgery was a distinct possibility and that surgery more than likely would require the injection of various chemicals into the [D]efendant's body that might compromise the integrity of a blood alcohol test or drug screen. Under these circumstances, the Court finds that there were exigent circumstances that justified taking of the blood sample.

> The Court finds that the fact that surgery was undertaken some five hours later or that the drug [D]ilau[d]in that was administered to the [D]efendant would not have affected the [toxicology screen] is not material. The test of reasonableness is determined in the subjective thoughts of the officer at the time the decision was made to order the blood sample. Wherefore, the Court overrules the Motion to Suppress.

## TRIAL

**State's Proof.** Officer Matt Sexton's testimony at trial was largely consistent with his testimony from the suppression hearing. He described the scene as "the worst wreck

[he had] ever seen" and recalled that the car was "nearly unrecognizable." Officer Sexton was sent to JCMC to obtain a sample of the Defendant's blood. He provided hospital staff with a TBI blood collection kit and waited outside of the curtain to the trauma bay while the nurse drew the Defendant's blood. After the nurse returned the blood sample, Officer Sexton returned to the scene of the accident and helped divert traffic and preserve the scene. On cross-examination, Officer Sexton testified that he had no "personal contact" with the Defendant and did not observe his injuries. He was informed that the Defendant had a leg injury but knew of no other injuries.

Captain Greg Workman likewise testified consistently with his testimony from the suppression hearing. He described the duties of the officers on the scene as follows:

> [F]irst off, we had to preserve that crime scene. This happened on Milligan Highway, so we had to divert traffic. So, that tied up at least three officers to divert traffic so we would have no other vehicles[] or individuals coming up on that scene. We had one that was responsible for photography of that scene. We also had individuals that were responsible for making the markings of the skid marks, the final rest of the vehicle, final rest of heavy objects of the vehicle that were dislodged from the impact. And also we had a scribe and then we had other individuals that were responsible for taking the measurements of that scene.

Based on his experience and observations at the scene, Captain Workman concluded that the Defendant may have been under the influence of alcohol, and he directed Officer Sexton to go to JCMC to obtain a sample of the Defendant's blood. On cross-examination, Captain Workman agreed that he did not hire an expert to examine the car for other possible causes for the accident.

Officer Ryan Brackett also testified consistently with his testimony from the suppression hearing. At trial, he was qualified as an expert in traffic reconstruction and testified about the accident reconstruction in this case. He opined that the Defendant's car was traveling at least 91.3 miles per hour prior to braking, evidenced by the start of skid marks on Milligan Highway, and was traveling 75 to 85 miles per hour at the time of impact. On cross-examination, Officer Brackett stated that he conducted a background check on the car through Rick Hill Imports and the National Institute of Highway Safety and found no recall on a 2002 BMW. He agreed that he found the victim's cell phone at the scene and returned it to the victim's father. He did not search the phone because he did not have a search warrant or permission from the victim's family to do so and because he did not think it was relevant.

-6-

TBI Special Agent Stephanie Dotson testified as an expert in the field of forensic science. She analyzed the Defendant's blood sample in the present case and testified that his blood alcohol content was .14 grams percent. She recorded these findings in a report, which was introduced into evidence.

Dr. Ken Ferslew testified as an expert in forensic toxicology and reviewed the findings in the Defendant's case. In analyzing the Defendant's case, he was provided the crash report, the officers' notes, the Defendant's medical records, and the TBI toxicology reports of the Defendant's blood sample. He explained that based on the evidence he was provided, he was able to calculate a predicted blood alcohol content of .152 grams percent at the time of the crash. He noted that this percent would have been the highest possible concentration prior to the accident. Dr. Ferslew testified that such concentration levels of impairment often cause loss of inhibitions, euphoria, psychomotor impairment, ataxia, motor-incoordination, and an increase in personality. Dr. Ferslew testified that the Defendant was intoxicated at the time of the crash but acknowledged that he could not testify as to the extent of his impairment because no psychomotor evaluations, such as a field sobriety test, were performed on him. He stated, however, that regardless of the extent of the Defendant's impairment, his intoxication "would have contributed to his mis-operation of the vehicle."

**Defendant's Proof.** Wayne Pritchard, a Carter County Sheriff's Deputy, testified that he arrived on the scene two or three minutes before any EPD officers arrived and found the Defendant lying on the ground outside of the car. He asked the Defendant whether any other occupants were in the vehicle, and the Defendant informed him that there was another passenger.

Quinton Garrett, a friend of the Defendant and the victim, testified that he rode with the Defendant to the victim's apartment on the night of August 13, 2012. He testified that he did not see the Defendant consume any alcohol prior to arriving at the victim's apartment and that the Defendant did not bring any alcohol to the apartment. He observed the Defendant drink alcohol at the victim's apartment but did not know how much he drank. When asked about the state of the Defendant's sobriety, Garrett testified, "If I didn't see him [drink] I wouldn't think he had been drinking at all." Garrett recalled that the Defendant asked the victim if he wanted to ride with him to the store to buy cigarettes and the victim agreed.

The Defendant testified that he was 19 years old and a junior at East Tennessee State University at the time of the accident. He had known the victim since 5th or 6th grade, and the two were best friends. On August 13, 2012, the victim invited the Defendant and several other friends to his apartment to play a drinking game. The Defendant testified that he did not drink any alcohol prior to arriving at the victim's

apartment and estimated that he consumed three alcoholic beverages while at the victim's apartment. After several hours, the group "decided that we needed more cigarettes if we were going to keep drinking." The Defendant believed that he was sober enough to drive to the store, and the victim agreed to ride with him. After purchasing a pack of cigarettes at the store, the Defendant and victim drove back towards the victim's apartment. The Defendant described the events as follows:

> I just remember lighting up a cigarette, pulling out of the [store] parking lot, roll[ing] the windows down. . . . [We took] the same route that we had taken to get there, the Milligan Highway. We . . . turned up the music, started speeding, . . . then we c[a]me to the straightaway.
>
> . . . .
>
> [A]pproaching the turn I actually remember . . . everything was normal. I go to just take the turn . . . [and] realize that . . . something was wrong. My first reaction is just brakes 'cause I . . . was speeding and the recommended speed on that road is 40, 45 whatever. I was definitely above that, so, I hit the brakes. Nothing – part of the brakes. Nothing from the steering.

The Defendant explained that when he turned the wheel, "nothing happen[ed]." He testified that he had problems with the steering in his car prior to the accident and had it repaired in May 2012.

After the accident, the Defendant immediately yelled for the victim. He smelled "gas and other things" so he climbed out of the car. When he tried to stand up to look for the victim, he realized his leg was broken. He waved down a passing truck and told the two men to help the victim get out of the car and to call the police. The Defendant was taken to the hospital for medical treatment and was told that the victim was killed in the accident the following morning. On cross-examination, the Defendant denied that anyone else offered to drive to the store that night. He agreed that he made the decision to drive to the store knowing that he was not fully sober and that he made a conscious decision to speed.

Jeff Gwinn, the owner and operator of Jeff's Paint and Body, testified that he repaired the Defendant's car in June 2012. He recalled that he repaired, among other things, the right tie rod of the vehicle. He agreed that the Defendant presented him a parts list from Rick Hill Imports detailing the parts and repairs he wanted and that most of the parts dealt with the suspension of the car. He also agreed that not all of the parts and repairs on that list were completed. On cross-examination, he explained that there is a difference in the quote estimate and the final bill because "I give a quote and then I go

-8-

off of what we find when we get up in the air." He agreed that if he saw something on the car that was not repaired that he believed to be dangerous, he would have notified the owner. With regard to the Defendant's car, he insisted that there was "nothing that was not repaired." After returning the car to the Defendant, he was not contacted by the Defendant about any problems with the car.

**State's Rebutal Proof.** On rebuttal, the State called Hunter Kitchens, a friend of the Defendant and victim who was at the victim's apartment on the night of August 13, 2012. He testified that he observed the Defendant drinking alcohol at the victim's apartment that evening and that he offered to drive to get more cigarettes. The Defendant declined his offer and said he was "okay to drive." On cross-examination, Kitchens testified that the Defendant and the victim were "best friends . . . honestly more like brothers."

Following deliberations, the Defendant was convicted of vehicular homicide by intoxication. At the sentencing hearing, the trial court denied alternative sentencing and imposed the minimum sentence of eight years' confinement, to be served at 30 percent. On May 29, 2014, the Defendant filed a timely motion for new trial and new sentencing hearing. He subsequently filed an amended motion for new trial and new sentencing hearing, and a hearing was held on the matter on July 1, 2014. On July 7, 2014, the trial court denied the Defendant's motion.

The Defendant now timely appeals.

## ANALYSIS

**I. Motion to Suppress.** The Defendant first challenges the trial court's denial of his motion to suppress the evidence obtained from a warrantless blood draw taken pursuant to Tennessee Code Annotated section 55-10-406(f)(1) (2012). Specifically, he asserts that the blood draw, taken without his consent, violated his right to be free from unreasonable searches and seizures and that it was not justified by any exception to the warrant requirement. The State responds that the warrantless blood draw was justified by consent and exigent circumstances, and thus, the trial court properly denied the Defendant's motion. Upon our thorough review of the record, we agree with the Defendant that no exception to the warrant requirement existed to justify the warrantless blood draw.

When evaluating a trial court's ruling on a motion to suppress, this court may consider the proof presented at both the suppression hearing and at trial. State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012) (citing State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998)). "A trial court's findings of fact in a suppression hearing will

be upheld unless the evidence preponderates otherwise." State v. Williams, 185 S.W.3d 311, 314 (Tenn. 2006) (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23. However, this court's review of a trial court's application of the law to the facts is de novo. State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008) (citing Williams, 185 S.W.3d at 315; State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. These constitutional protections are designed to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting Camara v. Mun. Court, 387 U.S. 523, 528 (1967)). "The touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991). "[U]nder both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629 (citing Coolidge v. New Hampshire, 403 U.S. 443, 454–55 (1971); State v. Bartram, 925 S.W.2d 227, 229–30 (Tenn. 1996)). The State bears the burden to establish by a preponderance of the evidence that a warrantless search or seizure is constitutional. See, e.g., State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998).

The drawing of the Defendant's blood unquestionably constituted a search implicating Fourth Amendment protections. "Such an invasion of bodily integrity implicates an individual's 'most personal and deep-rooted expectations of privacy.'" Missouri v. McNeely, 133 S. Ct. 1552, 1558 (2013) (quoting Winston v. Lee, 470 U.S. 753, 760 (1985)); see also Skinner v. Railway Labor Executives' Ass'n., 489 U.S. 602 (1989). Thus, "the importance of requiring authorization by a 'neutral and detached magistrate' before allowing a law enforcement officer to 'invade another's body in search of evidence of guilt is indisputable and great.'" Id. (quoting Schmerber v. California, 384 U.S. 757, 770 (1966)). As noted, however, the warrant requirement is subject to

exceptions. These recognized exceptions include "search incident to arrest, plain view, stop and frisk, hot pursuit, search under exigent circumstances, and . . . consent to search." State v. Charles A. Kennedy, No. M2013-02207-CCA-R9-CD, 2014 WL 4953586, at *6 (Tenn. Crim. App. Oct. 3, 2014) (quoting State v. Cox, 171 S.W.3d 174, 179 (Tenn. 2005)).

**Consent.** We first address the State's contention that the warrantless blood draw was justified by the consent exception to the warrant requirement based upon the implied consent statute. Under the implied consent statute, anyone who drives a car in this state "is deemed to have given consent to a test or tests for the purposes of determining the alcoholic content of that person's blood[.]" T.C.A. § 55-10-406(a) (2012). The statute further provides that a driver may generally refuse to consent to such a test and be subject to a violation of the implied consent law. See id. § 55–10–406(a)(4)(A).[3] However, section (f) delineates exceptions to the driver's statutory right to refuse consent, which includes where a law enforcement officer has probable cause to believe that a driver involved in an accident resulting in the injury or death of another was under the influence of alcohol. See id. § 55-10-406(f)(1).[4] Based on these provisions, the State asserts that the Defendant impliedly consented to a blood draw when he chose to operate his car on the roadways in Tennessee. Because there is no indication in the record that he revoked this consent, the State maintains that his implied consent remained valid and was sufficient for Fourth Amendment purposes to justify the warrantless blood draw.

Despite these arguments on appeal, the State conceded at the suppression hearing that this case involved a "non-consensual blood draw" and relied solely on exigent circumstances to justify the search. "When an issue is raised for the first time on appeal, it is typically waived." State v. Maddin, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005); see also, e.g., Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Simpson v. Frontier Community Credit Union, 810 S.W.2d 147, 153 (Tenn. 1991) ("[I]ssues not raised in the trial court cannot be raised for the first time on appeal.") (citations omitted); Charles A. Kennedy, 2014 WL 4953586, at *10 ("Because the State failed to present this argument in the trial court, the trial court did not have the opportunity to pass on it, and we will not consider it."). Accordingly, we conclude that the State has waived our consideration of this issue and decline to address it.

---

[3] The implied consent statute has since been revised, and this provision is now codified at Tennessee Code Annotated section 55-10-406(d)(1) (Supp. 2013).

[4] Following the revision of the implied consent statute, this provision is now codified at Tennessee Code Annotated section 55-10-406(d)(5)(A) (Supp. 2013).

**Exigent Circumstances.** The State also argues that the warrantless blood draw in this case was justified by exigent circumstances. This exception applies "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." McNeely, 133 S. Ct. at 1558 (quoting Kentucky v. King, 131 S. Ct. 1849, 1856 (2011)). "[T]he inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant." State v. Meeks, 262 S.W.3d 710, 723 (Tenn. 2008). "Mere speculation is inadequate; rather, the State must rely upon specific and articulable facts and the reasonable inferences drawn from them." Id. "A variety of circumstances may give rise to an exigency sufficient to justify a warrantless search," including, as relevant here, the prevention of "the imminent destruction of evidence." Id. (citations omitted). "To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, this Court looks to the totality of the circumstances." Id. at 1159 (citing Brigham City v. Stuart, 547 U.S. 398, 406 (2006); Illinois v. McArthur, 531 U.S. 326, 331 (2001); Richards v. Wisconsin, 520 U.S. 385, 391–96 (1997); Cupp v. Murphy, 412 U.S. 291, 296 (1973)).

In the context of drunk-driving cases, as in other contexts, exigency must be determined on a case-by-case basis. McNeely, 133 S. Ct. at 1556; see, e.g., State v. James K, Gardner, No. E2014-00310-CCA-R3-CD, 2014 WL 5840551, at *8 (Tenn. Crim. App. Nov. 12, 2014); State v. James Dean Wells, No. M2013-01145-CCA-R9-CD, 2014 WL 4977356, at *4-5 (Tenn. Crim. App. Oct. 6, 2014); Charles A. Kennedy, 2014 WL 4953586, at *7 (Tenn. Crim. App. Oct. 3, 2014). While the natural dissipation of alcohol from the bloodstream can be considered as a factor in determining exigency, it does not create a per se exigency sufficient to dispense with the warrant requirement in every drunk-driving case. McNeely, 133 S. Ct. at 1563. Indeed, "some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test; however, "[i]n those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." McNeely, 133 S. Ct. at 1561.

Turning to the instant case, the record establishes that the accident occurred at approximately 1:50 a.m. and that multiple emergency response workers, including county and city police officers, the local fire department, and an emergency medical service team, responded to the scene within minutes. The Defendant was injured in the accident and transported to the hospital in an ambulance within 25 minutes of the accident. His blood was drawn at 2:30 a.m., approximately 45 minutes after the accident. In total, 11 Elizabethton city police officers responded to the scene and at least four of these officers had experience drafting search warrants. Further, Captain Workman testified that two

-12-

judges lived within a few miles of the accident and were willing to review and sign search warrants at any hour of the night. Rather than start the process of obtaining a search warrant, however, Captain Workman directed Officer Sexton to follow the Defendant to the hospital to obtain a sample of his blood without a warrant.

In finding exigent circumstances, the trial court emphasized that the accident occurred late at night when no officers were on duty at the police department; thus, in order to obtain a warrant, an officer would have had to leave the scene and return to the police department to draft a warrant, contact an assistant district attorney to review the warrant, and contact a judge to sign the warrant. The court found that this process would have "taken some time to complete" and, when coupled with the fact that the Defendant was likely to undergo surgery, made obtaining a warrant impractical. In our view, however, these circumstances are not unique nor do they, without more, create exigent circumstances to justify the warrantless blood draw. There was no evidence in the record about the length of time it actually would have taken to obtain a warrant, and there was nothing to suggest that obtaining a warrant on this particular night would have taken longer than in other cases. Further, while Captain Workman testified that it was necessary for all of the responding officers to remain on the scene to investigate and clear it before the morning commute, the record confirms that at least two officers were directed to leave the scene to obtain blood samples from the Defendant and the victim. The State fails to explain why one of these officers could not have returned to the police department to start the warrant process while the Defendant was being transported to the hospital. See McNeely, 133 S. Ct. at 1561 ("Consider, for example, a situation in which the warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer. In such a circumstance, there would be no plausible justification for an exception to the warrant requirement."). Likewise, Captain Workman's concerns about surgery were based upon nothing more than mere speculation and were not supported by any specific and articulable facts. To support a finding of exigent circumstances, the Fourth Amendment demands more. See Meeks, 262 S.W.3d at 723.

As noted by the Supreme Court in McNeely, "some delay between the time of the arrest or accident and the time of the test is inevitable regardless of whether police officers are required to obtain a warrant." McNeely, 133 S. Ct. at 1561 (citation omitted). We do not doubt that there would have been some delay caused by obtaining a warrant in the instant case. Notwithstanding, the State failed to show that this delay would have "significantly undermined the efficacy of the search." See id. Consequently, we cannot conclude that exigent circumstances justified the warrantless search. Therefore, we reverse the judgment of the trial court denying the Defendant's motion to suppress evidence obtained as a result of the blood draw, vacate the Defendant's conviction, and

-13-

remand this case for a new trial where the blood test results will be inadmissible. In case of further review, we will address the additional issues raised by the Defendant.

**II. Sentencing.** The Defendant also raises several challenges to his sentence of eight years' confinement. Specifically, he argues that the trial court abused its discretion in denying alternative sentencing and that the trial court improperly admitted victim impact statements and testimony from members of the victim's family who fell outside of the Victim Impact Statement Act. The State responds that the trial court did not err in sentencing the Defendant. We agree with the State.

At the sentencing hearing, the State introduced the Defendant's presentence report and a number of victim impact statements. The State also called several of the victim's family members to testify at the hearing. After arguments by the State and the Defendant, the trial court made oral findings and imposed the following sentence:

> The court finds that there are no enhancement factors in this case and there are no mitigating factors in this case. The court sentences this defendant to eight years in the Department of Correction[] as a Standard Offender to serve 30% before he's eligible for release. The [court] has considered the sentencing alternatives in this case, has considered the recklessness of this case not only the drinking but the excessive speed in this case. The court has considered that our . . . highways are becoming . . . slaughterhouses for people who don't think before they drink and drive and that confinement is necessary to avoid deprec[i]ating the seriousness of the offense and therefore denies any alternative sentencing.

Subsequently, at the hearing on the motion for new trial and new sentencing hearing, the trial court clarified its earlier findings:

> [T]he court found no enhancement factors in this case whatsoever. [The Defendant] didn't have a prior record. He . . . hadn't been committed while he was on release. I could find no enhancement factors under the statute that applied to this case at all. I could find no mitigating factors about this case. I did notice that this defendant . . . showed some remorse, but that remorse was I think to be expected. . . . This court denied . . . alternative sentencing on the sole basis of . . . the fact that . . . confinement was necessary to [avoid] deprec[i]at[ing] the seriousness of this offense. As I mentioned in my statements[,] it was a horrific accident. It involved both speed and . . . drinking. I mentioned . . . that whether or not this was applicable[,] . . . our highways have become slaughterhouses . . . . [T]he sole purpose of not granting any type of alternative sentencing is that . . . to

have done so would have deprec[i]ated the seriousness of a very tragic, tragic accident which involved absolutely no thought of the consequences of drinking and engaging in . . . the speed.

Having articulated its reasons for denying alternative sentencing, the trial court denied the Defendant's motion for a new sentencing hearing.

Because of the broad discretion given to trial courts by the 2005 amendments to the Sentencing Act, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001). This standard of review applies to a trial court's decision regarding "probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

Pursuant to the 2005 amendments to the Sentencing Act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b)(1)-(7) (2014). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d) (2010), Sentencing Comm'n Cmts. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102, -103 (2014). In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). Tennessee Code Annotated section 40-35-102(6)(A) states that a defendant who does not require confinement under subsection (5) and "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" However, a trial court "shall consider, but is not bound by, the advisory sentencing guideline" in section 40-35-102(6)(A). T.C.A. § 40-35-102(6)(D). A trial court should consider the following when determining whether there is "evidence to the contrary" indicating that an individual should not receive alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. T.C.A. § 40-35-303(a) (2010). The trial court shall automatically consider probation as a sentencing alternative for eligible defendants; however, the defendant bears the burden of proving his or her suitability for probation. Id. § 40-35-303(b). In addition, "the defendant is not automatically entitled to probation as a matter of law." Id. § 40-35-303(b), Sentencing Comm'n Cmts. Rather, the defendant must demonstrate that probation would "'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)).

When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, the defendant's present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public. See State v. Kendrick, 10 S.W.3d 650, 656 (Tenn. Crim. App.

1999) (citing State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978)).  In addition, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed[,]" and "[t]he length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence[.]"  T.C.A. § 40-35-103(5).

In the case sub judice, the Defendant argues that the trial court failed to articulate reasons supporting its decision and improperly relied on elements of the offense to deny alternative sentencing.  He further argues that the court based its decision upon a need for deterrence, which was not supported by specific evidence in the record.  See State v. Hooper, 29 S.W.3d 1, 13 (Tenn. 2000) (holding that the sentencing court could rely on deterrence alone to support a denial of probation or an alternative sentence if the record "contain[ed]  evidence which would enable a reasonable person to conclude that (1) deterrence is needed in the community, jurisdiction, or state; and (2) the defendant's incarceration may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes").  However, a review of the record belies these assertions.

The trial court's oral findings show that it properly considered the facts and circumstances of this particular offense and the appropriate sentencing principles when rendering its decision.  Although the State and the Defendant argued for application of various enhancement and mitigating factors, the court found no factors applicable to the Defendant's case.  The court acknowledged the Defendant's lack of a criminal record and his expression of remorse but noted the "horrific" and "tragic" nature of the accident.  While the trial court stated its concern that "our highways have become slaughterhouses," the record clearly indicates that the court based its decision "solely" on the fact that alternative sentencing would depreciate the seriousness of the offense.  Tennessee courts have held that if the seriousness of the offense forms the basis for the denial of alternative sentencing, "'the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring a sentence other than confinement."[5]  State v. Bottoms, 87 S.W.3d 95, 103 (Tenn. Crim.

---

[5] This court has questioned the continued viability of the heightened standard of review where the trial court denies alternative sentencing solely on the need to avoid depreciating the seriousness of the offense in light of Bise and Caudle.  See State v. Edward Shannon Polen, No. M2012-01811-CCA-R3-CD, 2014 WL 1354943, at *8 (Tenn. Crim. App. Apr.4, 2014), perm. app. denied (Tenn. Aug. 29, 2014); State v. Delavan Benjamin Mohammed, No. M2011-02552-CCA-R3-CD, 2013 WL 1874789, at *6 (Tenn. Crim. App. May 3, 2013), perm. app. denied (Tenn. Oct. 16, 2013).  However, in State v. Kyto Sihapanya, the Tennessee Supreme Court seemingly indicated that the heightened standard of review is still applicable "in cases in which the trial court denies probation based on only" the seriousness of the offense.  --- S.W.3d ----, 2014 WL 2466054, at *3 (Tenn. Apr.30, 2014).

App. 2001) (quoting State v. Hartley, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991)); see also State v. Trotter, 201 S.W.3d 651, 654 (Tenn. 2006). As correctly noted by the Defendant, a trial court may not consider factors that constitute elements of the offense in determining whether the circumstances of an offense satisfy this standard. See Housewright, 982 S.W.2d at 358 (citing State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995), overruled on other grounds by Hooper, 910 S.W.3d at 10). In contrast to the assertions of the Defendant, however, the trial court in the instant case did not rely on elements of the offense to deny alternative sentencing. Rather, the court's ruling makes clear that it focused on the specific circumstances of the offense and concluded that alternative sentencing was not warranted. The court emphasized the fact that the accident involved both excessive speed and alcohol and that the Defendant gave "no thought to the consequences" of his actions. The record supports the trial court's conclusion and its decision to deny alternative sentencing on this basis. Accordingly, we conclude that the trial court did not abuse its discretion in sentencing the Defendant.

The Defendant also argues that the trial court improperly admitted victim impact statements and victim impact testimony at the sentencing hearing. Specifically, he complains that the trial court admitted victim impact statements from the Defendant's aunt and uncle although these family members are not "victims" as defined by the Victim Impact Statement Act. See T.C.A. § 40-38-203(3) (defining "victim" to include "immediate family member[s]" of a homicide victim). He further argues that the trial court erred in allowing these family members to testify at the sentencing hearing. Despite extensive argument on appeal, however, the Defendant failed to contemporaneously object to this evidence at the sentencing hearing. Relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." See Tenn. R. App. P. 36(a). Likewise, a party typically waives review of the trial court's admission of evidence if that party fails to make a contemporaneous objection. See State v. Reid, 213 S.W.3d 792, 847 (Tenn. 2006) (citations omitted); State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999) (citing Tenn. R. App. P. 36(a)).

Waiver notwithstanding, we conclude that any error in admitting the written statements or oral testimony of these additional family members was harmless because it did not affect the outcome of the case. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). At the motion for new trial and new sentencing hearings, the trial court indicated that it "placed very little emphasis on the victim impact testimony in this case" and stated, "[N]o comments, no testimony that they presented at the sentencing hearing had any effect on the court in . . . determining whether or not a . . . specific sentencing principle was

-18-

involved." The court then articulated the facts and circumstances that it found relevant in denying alternative sentencing and reiterated that it based its decision on the need to avoid depreciating the seriousness of the offense. The Defendant has pointed to nothing in the record to show that the trial court's decision was improperly influenced by this evidence. Accordingly, we conclude that the Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing authorities and analysis, we conclude that the trial court erred by denying the Defendant's motion to suppress evidence obtained from the warrantless blood draw. Accordingly, we reverse the judgment of the trial court in this respect, vacate the Defendant's conviction, and remand for a new trial.

_____
CAMILLE R. MCMULLEN, JUDGE